# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00028-CV

### B. Shannon Davis and Susan Davis, Appellants

### v.

### Julie Guerrero and Luis A. Rios, Appellees

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 175,959-D, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

This appeal concerns the propriety of a district court's modification of an order in a suit affecting the parent-child relationship ("Kansas order"). B. Shannon Davis and Susan Davis contend that the district court should have abated its consideration of the Kansas order in deference to the existence in the county court at law of a guardianship order and a motion to revoke that guardianship. We conclude that the district court should not have modified the Kansas order until the guardianship issue was resolved; accordingly, we conclude that the district court erred by awarding attorney's fees against appellants. We vacate the modification order and remand the cause.

## BACKGROUND

Collette Davis was born to Julie Guerrero ("Julie"[1]) and Luis A. Rios in December 1993. The primary contestants for custody are Julie and her parents, the Davises. Collette moved

---

[1] Julie Davis married Roman Guerrero in 1997. To avoid using a chronologically inapplicable surname or confusion with her husband or parents, we will refer to her as "Julie."

eleven times among four states before her sixth birthday due to her maternal grandfather's military career and her mother's tempestuous relationship with Roman Guerrero. Custody of Collette was the subject of a Kansas order and a Texas guardianship. Though the points of error in this case are essentially procedural, the following factual background gives context to the disputed court actions.

### *Factual background*

Julie and Rios met in Kentucky where their fathers were stationed in the military. Rios's father retired and moved his family to Florida; Julie's father, Shannon Davis, stayed in the military and moved his family to his new post in Kansas. The fifteen-year-old Julie visited the Rioses during spring break from school and deliberately became pregnant so she could move to Florida to be with Rios. By her fifth month of pregnancy, however, she had moved out and wanted an abortion. Instead, she moved to Kansas with her parents and decided to put the child up for adoption; Rios scuttled that plan by refusing to agree to terminate his parental rights.

In August 1994, a Kansas court signed the Kansas order (entitled "A Journal Entry Establishing Paternity, Setting Child Support and Visitation, Splitting Insurance and Medical Bills, and Denying Motion to Change Minor Child's Last Name"). The court appointed Julie and Rios joint custodians, giving Julie "primary residential custody." The Davises are not mentioned in the Kansas order. The Davis family (including Julie and Collette) had already moved to Texas in June 1994 pursuant to Shannon's biennial reassignment by the military. Julie lived with her parents for a while as she graduated from high school and attended college. She then moved out to live with Roman Guerrero (now her husband), leaving Collette with the Davises; according to the Davises, she visited them and Collette about every other week.

2

In April 1996, the Davises petitioned Bell County Court at Law No. 1 ("county court") to name them Collette's guardians. They alleged that the guardianship was necessary to provide Collette health insurance, support, and other benefits. They requested that the guardianship last until Collette turns eighteen years old or Julie lives with Collette outside their home. Julie agreed to the guardianship, but says she believed it to be limited in scope. On July 21, 2000, the county court appointed Shannon alone to be Collette's guardian without a limitation on his powers or the term of the guardianship.

Also in July 1996, the Davises and Collette moved to Hawaii, while Julie stayed in Texas to finish her associate's degree. She lived with Roman's parents before moving to Hawaii in December 1996. Julie attended the University of Hawaii for part of the Spring 1997 semester before dropping out and returning to Texas where she and Roman planned a December wedding. She became pregnant and they accelerated the wedding to October 1997; the Davises brought Collette to the wedding and left her with the couple in Texas. However, the Davises took Collette back to Hawaii in January 1998 when the Guerreros were having marital troubles. Julie gave birth to a son in April 1998.

When the Davises moved to Colorado in June 1998, they let the reconciled Guerreros take Collette to Texas. The Davises took Collette back to Colorado for a month-long visit in the summer. Shannon returned the child in September 1998 even though the Guerreros' marriage was again deteriorating. In November 1998, further deterioration caused Julie to send Collette back to the Davises; Roman filed for divorce. At Christmas 1998, Julie convinced the Davises that she and Roman had reconciled and that Collette should come to live with her. In May 1999, having seen that

3

the Guerreros' marriage was again rocky, the Davises took Collette back to Colorado. Julie had agreed to let them take the child for a visit, then reneged when her attorney told her the visit would hurt her chance to dissolve the guardianship. Julie tried to prevent their departure by occupying their van until Shannon dragged her out and called the police, who refused to intervene in a civil domestic dispute; after consulting with her attorney, Julie agreed to let the Davises take Collette back to Colorado. As detailed below, in October 1999, Julie filed motions to revoke the guardianship and to enforce the Kansas order which gave her the right to determine the child's residence. Collette remained with her grandparents until the district court temporarily ordered shared access between the Davises and Julie in February 2000, pending resolution of this custody dispute.

None of the ample testimony regarding various deficiencies in the Guerrero and Davis households bears on or provides meaningful context for the procedures challenged on appeal.

### Procedural background

The contest for legal possession of Collette proceeded in county and district courts in Bell County, though most of the action occurred in the district court.

On June 18, 1999, the Texas attorney general registered the Kansas order in Texas by suing to enforce its support provisions against Rios on Julie's behalf. In July 1999, Rios agreed to the entry of the district-court judgment for arrearages on child support.

On October 8, 1999, Julie filed a motion in county court to revoke the guardianship established there in July 1996. Julie contended that Collette no longer needed a guardian. Julie then filed a motion in district court on October 25, 1999 seeking to enforce the Kansas order's provision awarding her "primary residential custody." In response, on November 5, 1999, the Davises filed a

4

motion to modify the Kansas order, requesting that the district court name them primary joint managing conservators. On November 10, 1999, the Davises filed a motion to abate the case pending resolution of Julie's motion in county court to revoke the guardianship. (Though the plea in abatement appears in their response to the enforcement motion, the Davises ask that the "case" be abated—a request that would also halt consideration of their previously filed motion to modify filed in the same case.) Julie later filed a motion to modify the Kansas order, requesting that her parents be named possessory conservators.

No signed order denying the motion to abate appears in the record, but the district court implicitly overruled the motion by holding a jury trial on the motions to modify and signing its Order in Suit to Modify Parent-Child Relationship. *See* Tex. R. App. P. 33.1(a)(2)(A). In that order, signed December 20, 2000, the district court continued Julie and Rios as joint managing conservators and affirmed Julie's right to establish Collette's primary residence. The court also granted Rios, the biological father, visitation for the first time in Collette's life. Additionally, the court named the Davises as possessory conservators entitled to possession of Collette for twenty-one days in the summer. The district court's order granting Julie the right to establish Collette's primary residence conflicts with the county court's order naming Shannon the guardian of Collette.

## DISCUSSION

The Davises contend that the district court lacked jurisdiction to modify the Kansas order (1) because Julie did not properly register the Kansas order, (2) because Texas is not Collette's home state, and (3) because of the pending guardianship proceeding. They contend that the district

5

court should have abated the custody proceeding in deference to the guardianship proceeding. They also contend that the district court erred by assessing attorney's fees against them.

The Davises argue that the district court lacked jurisdiction because Julie did not register the Kansas order. Because jurisdiction is a question of law, we review the trial court's decision de novo. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998); *see also In re M.W.T.*, 12 S.W.3d 598, 601 (Tex. App.—San Antonio 2000, pet. denied). It is not clear that formal registration was either mandatory or jurisdictional for modification or enforcement proceedings. *See* Act of April 6, 1995, 74th Leg., R.S., ch. 20 § 1, 1995 Tex. Gen. Laws 113, 145, codified at Tex. Fam. Code Ann. §§ 152.013-.015, deleted by Act of April 22, 1999, 76th Leg., ch. 34, § 1, 1999 Tex. Gen. Laws 52, 68 ("Old Code"). If registration was required, the Texas attorney general registered the Kansas order as a Texas order when enforcing the child-support provisions, and the Davises registered it under the new provisions[2] when filing their motion to modify—or at least were estopped from complaining about its deficient registration when they stated in their petition in this suit that "[t]he order to be modified . . . [was] previously registered with the 264th District Court of Bell County."

The Davises also assert that the district court lacked jurisdiction because Texas was not Collette's home state. A child's home state is "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." Tex. Fam. Code Ann. § 152.102(7) (West Supp. 2002). Collette's itinerant past left her with no home state. At the commencement of this suit, almost two years had

---

[2] *See* Tex. Fam. Code Ann. §§ 152.303-.306 (West Supp. 2002).

6

passed since Collette last lived in a single state for six consecutive months—the last time was from April to October 1997 when she lived in Hawaii with the Davises. Texas courts can modify orders affecting the parent-child relationship from other states if (1) Texas would have jurisdiction to make an original determination, and (2) neither the child, her parents, nor any persons acting as parents reside in the state of the order to be modified. *Id.* § 152.203. Neither the child, her parents, nor her guardian have lived in Kansas since 1994. Although Texas was not Collette's home state at the inception of this suit, Texas courts could properly exercise jurisdiction over her in a suit affecting the parent-child relationship ("SAPCR") if she and at least one parent or person acting as a parent have a significant connection with Texas other than mere physical presence and substantial evidence is available here concerning her care, protection, training, and personal relationships. *Id.* § 152.201(a)(2). Collette's mother has lived in this state since 1994 (except for about six months in 1997) and attended college here; Rios, Collette's father, has lived in Texas since 1997; and Collette lived in Texas for about thirty-seven of the first seventy months of her life. Several witnesses including friends, family, and health-care and child-care professionals in Texas testified about their contacts with the child. Texas courts can exercise jurisdiction over this SAPCR proceeding under this test.

Finally, we conclude that the guardianship did not strip the district court of jurisdiction; otherwise, the legislature could not have, as it has in the probate code,[3] permitted the

---

[3] *See* Tex. Prob. Code Ann. § 609(a) (West Supp. 2002). All cites to the probate code in this opinion are to sections contained in the supplemental volume. We will cite them as "Probate Code."

7

probate court to transfer a guardianship proceeding to a district court with a pending, related SAPCR proceeding because the court with the SAPCR proceeding would be without jurisdiction.

However, the existence of jurisdiction does not necessarily support the district court's exercise of that jurisdiction. The Davises argue that Julie's filing of the motion to revoke the guardianship in county court conferred jurisdiction on the county court that was dominant over the district court's jurisdiction to consider later-filed motions. The legislature anticipated this interaction of suits under the family code and the probate code, passing a statute providing that, if

> an interested person seeks the removal of a guardian of the person of a minor, the [probate court] judge, on the judge's own motion, *may* transfer all matters relating to the guardianship of the person of the minor to a court of competent jurisdiction in which a suit affecting the parent-child relationship under the Family Code is pending.

Probate Code § 609(a). Because the county court did not voluntarily transfer the guardianship issues to the district court, however, we must determine the propriety of the district court's failure to abate this proceeding pending the outcome of the guardianship matter.

The supreme court has provided guidance on when courts with jurisdiction should abate consideration of actions before them in deference to other courts considering similar suits. *See Wyatt v. Shaw Plumbing Co.*, 760 S.W.2d 245, 247-48 (Tex. 1988). The supreme court wrote that,

> [w]hen an inherent interrelation of the subject matter exists in two pending lawsuits, a plea in abatement in the second action must be granted. It is not required that the exact issues and all the parties be included in the first action before the second is filed, provided that the claim in the first suit may be amended to bring in all necessary and proper parties and issues. In determining whether an inherent interrelationship exists, courts should be guided by the rule governing persons to be joined if feasible and the compulsory counterclaim rule.

*Id.* at 247 (citations omitted).  The court also wrote:

> It is well settled that when suit would be proper in more than one county, the court in which suit is first filed acquires dominant jurisdiction to the exclusion of other courts.  *Curtis v. Gibbs*, 511 S.W.2d 263, 267 (Tex. 1974); *V.D. Anderson Co. v. Young*, 128 Tex. 631, 636, 101 S.W.2d 798, 800 (1937); *Cleveland v. Ward*, 116 Tex. 1, 19, 285 S.W. 1063, 1070 (1926).  As long as the forum is a proper one, it is the plaintiff's privilege to choose the forum.  *Mutual Sav. & Loan Ass'n v. Earnest*, 582 S.W.2d 534, 535 (Tex. Civ. App.—Texarkana 1979, no writ).  Defendants are simply not at liberty to decline to do battle in the forum chosen by the plaintiff. 2 R. McDonald, supra p. 3, § 7.49, at 254.  Abatement of a lawsuit due to the pendency of a prior suit is based on the principles of comity, convenience, and the necessity for an orderly procedure in the trial of contested issues.  *See McCurdy v. Gage*, 123 Tex. 558, 565-66, 69 S.W.2d 56, 59, *reh'g overruled per curiam and opinion adopted*, 75 S.W.2d 1107 (Tex. Comm'n App. 1934). . . .  There are three exceptions to the rule of *Cleveland v. Ward* that the court where suit is first filed acquires dominant jurisdiction: (1) Conduct by a party that estops him from asserting prior active jurisdiction; (2) lack of persons to be joined if feasible, or the power to bring them before the court; and (3) lack of intent to prosecute the first lawsuit.

*Id.* at 248 (footnote omitted).  We review the record to determine whether the district court abused its discretion by declining to abate its proceeding.  *Id.*  A trial court abuses its discretion when it acts in an unreasonable and arbitrary manner, or without reference to any guiding rules or principles.  *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

We note, however, that the *Wyatt* framework strains to encompass the long-term, continuous, and special natures of guardianships and SAPCRs, and that the overlap between the family and probate systems poses even more challenges.  The *Wyatt* case was a dispute between a plumbing contractor and a customer; the appeal concerned which of two lawsuits concerning the same transaction filed in district courts in different counties should be given sway.  *Id.* at 246.  Venue was proper in both counties.  *Id.* at 247.  The claims brought in each could have been brought in the

other, so the claims in the later-filed suit (brought by the defendant in the first-filed suit) should have been brought as compulsory counterclaims in the first-filed suit. *Id.* at 247-48. The *Wyatt* framework thus describes how to choose between competing suits filed in different counties that concern a particular transaction. It does not address how to resolve competing complaints that must be filed in different courts in the same county, the guardianship proceeding in the county court at law in its probate capacity[4] and the custody case in district court.[5] Nor does it neatly describe resolution of competing complaints about actions taken within statutory constructs that contemplate orders with administrations[6] ongoing for the minority of the child, including interim changes.[7]

The strain on the *Wyatt* framework is evident in this case. Courts must give precedence to the first-filed case. But, because both the motion to revoke the guardianship and the motions relating to the Kansas order were filed in causes that were initiated for other reasons, it is not clear which filing counts when deciding which suit was filed first. In the custody action, is it the filing of the suit in Kansas, the attorney general's motion to enforce the child-support provisions of the Kansas order in Texas, Julie's motion below to enforce the Kansas order, or one of the motions

---

[4] Three statutes combine to require that probate matters in Bell County be filed in the county court at law. *See* Probate Code §§ 605, 606(c); Tex. Gov't Code Ann. § 25.0162(h) (West 1988).

[5] The family code defines "court" as "the district court . . . or other court expressly given jurisdiction" of SAPCRs. Tex. Fam. Code Ann. § 101.008 (West 1996).

[6] *See* Probate Code §§ 694(b), 743 (governing appointment of guardians for minors and requiring annual reports from guardians); Tex. Fam. Code Ann. §§ 101.001, et seq. (West 1996 & West Supp. 2002) (governing child custody and support orders).

[7] Both codes provide for modification of the terms of the care for the minors and the removal of their caretakers. *See* Probate Code §§ 694H, 761; Tex. Fam. Code Ann. §§ 156.001, 161.001 (West 1996 & Supp. 2002).

below to modify the Kansas order in Texas? In the guardianship proceeding, is it the application for guardianship, the guardianship order, or the motion to revoke the guardianship? Further, the use of compulsory counterclaims is inapt to deal with these distinct orders, suits, and systems; although both suits concern possession of Collette and the right to make decisions concerning her, this county court cannot entertain a motion to modify the district court's Kansas order and, absent transfer of the guardianship disputes to the district court, the district court cannot entertain a motion to revoke the county court's guardianship order.[8]

Thus, there must be a test for dominant jurisdiction between suits involving the same children in the probate and family court systems. Otherwise, lack of comity between the involved courts could lead to simultaneous proceedings with conflicting results or a series of alternating orders in which competing courts countermand each other. Such tumult is unlikely to be in the best interest of the children involved.

We conclude that the guardianship order, particularly one that is agreed to by the mother entitled to determine the child's residence, essentially places in stasis the SAPCR order's provisions regarding possession and residence. Family courts should not entertain motions to alter SAPCR provisions relating to issues covered by the guardianship until the guardianship is revoked.

We reach the same conclusion even if we apply the *Wyatt* framework pragmatically to account for the anomalies due to these special systems. We would ignore the initiation of the proceedings which could occur in foreign courts and concern issues not relevant here. (We note that the first action filed in Texas courts concerning possession and residence of Collette was filed in

---

[8] This is true because of the jurisdiction restrictions discussed in notes 4 and 5 above.

11

county court.) Even if we look only at the filing of motions relating to the live dispute—here, Julie's quest to be Collette's primary caregiver and her parents' opposition—Julie filed the first motion affecting possession in the county court. Her motion to revoke the guardianship sought to erase the order entitling the Davises to possess Collette, revive the custody provisions of the Kansas order, now registered in Texas, and give Julie possession. Her filing of the motion to enforce the Kansas order in the district court and the Davises' subsequent motion in district court to modify the Kansas order in their favor made it possible, but not mandatory, for the county court to transfer the guardianship proceeding to the district court under Probate Code section 609. The Davises' motion to abate the district court action, filed five days after their motion to modify, put the district court on notice that its exercise of jurisdiction was potentially problematic. The motion formally told the district court that the guardianship, not the custody order, controlled possession and that a previously filed proceeding was underway in county court to assess whether the guardianship would continue to control possession of Collette. Julie's district-court motion to modify the Kansas order further signaled problems by indicating that she wished to change the custody order in effect to avoid the guardianship without having it revoked. Any modification of the custody order would conflict with an order from a coordinate court from the same county and would have no more effect than the original, superseded custody order. The district court nevertheless failed to abate its consideration of the custody case and proceeded to order the Davises to surrender Collette to Julie for specified weeks, to hold a jury trial, and to modify the custody order. The district court took these actions while the guardianship and Julie's motion to revoke it remained pending in county court.

12

Of the exceptions to the *Wyatt* test, Julie argues only that the Davises' filing of the initial motion to modify in the district court estops them from seeking abatement.[9] *See Wyatt*, 760 S.W.2d at 248. The Davises, however, did not initiate either of the tracks of the recent dispute. We are told of no actions by them in the guardianship proceeding. They filed their motion to modify the Kansas order almost a month after Julie moved to revoke the guardianship in county court and two weeks after she filed her district-court motion to accomplish the same result by enforcing the Kansas order. They filed their plea in abatement within four days of their motion to modify, indicating their preference for the resolution of the guardianship before Julie suffered any prejudice from the existence of their motion to modify; the hearing on Julie's motion for access occurred more than a month later, the trial occurred more than six months later, and the district court signed its order more than a year later.

We conclude that the district court abused its discretion by declining to abate the SAPCR proceeding. The guardianship order controlling possession, to which Julie acceded in 1996, was still in effect; the motion to revoke the guardianship was pending in the county court. The option to consolidate the guardianship revocation proceeding with the issues raised in the SAPCR lay with the county court; without the county-court record before us, we do not know whether the county

---

[9] There are two other exceptions—the lack of persons to be joined if feasible (or lack of power to bring them before the court) and lack of intent to prosecute the first lawsuit. *See Wyatt*, 760 S.W.2d at 248. Because of the distinct natures of the proceedings, it is not clear that the probate court could bring before it all the parties to the divorce decree to determine guardianship of the child; yet all the interested parties could choose to participate; because the district court could not itself directly modify the guardianship, the applicability of this exception is limited. The only information available regarding Julie's intent to pursue the revocation of the guardianship is that she would seek its revocation.

13

court was asked to transfer its proceeding to the district court. The existence of the guardianship meant that the county court had dominant jurisdiction over issues relating to possession and control of Collette. The district court should have addressed these issues only if they were transferred to the district court by the county court. After declining to abate its proceeding, the district court issued an order that conflicted with the guardianship order issued by the court with dominant jurisdiction.[10] The district court thereby showed a lack of comity and a disregard for "the necessity for an orderly procedure in the trial of contested issues." *See Wyatt*, 760 S.W.2d at 248. We hold that the district court abused its discretion by declining to abate its proceeding.

Because the district court should not have rendered any order, vacation of the order—including the award of attorney's fees—is appropriate. Once the county court resolves the challenge to the guardianship or exercises its option to transfer that dispute to the district court, the district court may dismiss this action, reinstate its modifications, or may consider developments since the jury trial in rendering a new SAPCR order; the district court has similar latitude regarding the imposition of attorney's fees. Accordingly, remand of this proceeding is appropriate.

## CONCLUSION

We vacate the district court's SAPCR order and remand this cause to the district court. The court shall hold this proceeding in abeyance until the county court has disposed of Julie's motion to revoke the guardianship or transferred that dispute under Probate Code section 609(a) to the district court where this SAPCR is pending. Possession of Collette is thus governed by the

---

[10] If there was an informal agreement by which the county court deferred to the district court's determination of custody and related issues, it is not apparent from the record in this appeal.

14

guardianship order in effect before the district court rendered the SAPCR order. We strongly urge the guardian and all interested parties to act in Collette's best interests in determining possession and visitation during the pendency of these proceedings.

_____

—

Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Puryear

Vacated and Remanded

Filed: January 10, 2002

Publish

15